AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

———————————— **DISTRICT OF** ————————————

| | |
|---|---|
| **In the Matter of the Search of**<br>(Name, address or brief description of person, property or premises to be searched)<br><br>135 VERNDALE AVENUE, PROVIDENCE<br>RHODE ISLAND, AS FURTHER DESCRIBED<br>IN ATTACHMENT A-2 | **APPLICATION AND AFFIDAVIT<br>FOR SEARCH WARRANT**<br><br>CASE NUMBER: *1: 05 M148 A* |

I _____ MICHAEL S. NAYLOR _____ being duly sworn depose and say:

I am a(n) _____ TASK FORCE AGENT WITH THE DEA _____ and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

135 VERNDALE STREET, PROVIDENCE, RI, AS FURTHER DESCRIBED IN ATTACHMENT A-2.

in the _____ District of _____ RHODE ISLAND _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

SEE ATTACHMENT B-2

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

EVIDENCE

concerning a violation of Title _____ 21 _____ United States code, Section(s) _____ 841, 846 _____ .

The facts to support a finding of Probable Cause are as follows:

SEE AFFIDAVIT OF TFA MICHAEL S. NAYLOR

Continued on the attached sheet and made a part hereof. ☑ Yes ☐ No

*[signature]*
Signature of Affiant

Sworn to before me, and subscribed in my presence

12/11/05
Date

at KINGSTON RI
City and State

LINCOLN D. ALMOND, U.S. MAGISTRATE JUDGE
Name and Title of Judicial Officer

*[signature]*
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

**Attachment A-2**
**135 Verndale Avenue, Providence, RI**

**Premises to be Searched**

135 Verndale Avenue is a two-story, single-family, structure, white in color with black shutters. The dwelling has one white front door facing Verndale Avenue. To the right of the premises, there is a driveway with a detached garage to the rear of the premises. The numerals "135" are visible on the front exterior of the residence.

The following is a true and accurate photograph of 135 Verndale Avenue, Providence:

**Attachment B-2**
**135 Verndale Avenue, Providence, RI**

**Items to be Seized**

1.    Controlled substances including cocaine and/or heroin;

2.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.    Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

4.     Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6.    Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

7.    Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

8.    Keys to safety deposit boxes.

9.    Cameras and surveillance equipment.

10.    Cellular telephones.

31

ATTACHMENT A-2



135 Verndale Avenue, Providence, RI

### AFFIDAVIT OF TASK FORCE AGENT MICHAEL S. NAYLOR
### (FILED UNDER SEAL)

Task Force Agent Michael S. Naylor deposes and states as follows:

A.    **INTRODUCTION**

1. I am a law enforcement officer with the Newport Police Department and hold the rank of narcotics detective. I have been employed by the Newport Police Department for twelve (12) years. I have participated in investigations involving drug trafficking activities for the past seven (7) years. For the past year I have been assigned as a Task Force Agent with the Drug Enforcement Administration (DEA), Providence Resident Office, of the United States Department of Justice. Since becoming a Task Force Agent with DEA, I have conducted numerous investigations of unlawful drug distribution in violation of 21 U.S.C. § 841(a)(1), 843(b), 846, and have participated in wire and physical surveillance, undercover operations, execution of search warrants, and debriefing of informants. I have attended DEA training on undercover operations and the use of informants. In addition, I have attended numerous drug interdiction trainings conducted by the Drug Enforcement Agency (DEA) and other privately run seminars. I have testified in state and federal courts as well as grand juries numerous times concerning my participation in narcotics investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed.

2. Based upon my training and experience, I am also familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Specifically,

1

I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I also am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities. I also am familiar with the vernacular or street-names for users and distributors of controlled substances and the methods by which such persons attempt to disguise the subjects of their conversations and operations.

3.     Based on my training and experience, I know that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. In addition, it is common practice for drug traffickers to maintain documents and paperwork that records their drug trafficking operation, such as a list of who owes them money, the amount of money owed, quantities of narcotics that were distributed, money owed to their suppliers, and so forth. Based on my experience, these documents are kept for a long period of time by the drug traffickers because they contain valuable information that facilitates the operation of the drug traffickers' business. Based on my training and experience, I

2

also know that it is common for drug traffickers to possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs. Finally, I know that drug trafficking activity is a continuous activity that takes place during the daytime and the nighttime hours. As set forth more specifically below, in this particular investigation, court-authorized interception of telephone calls made by the subjects of this investigation revealed that the drug trafficking activities by the subjects routinely took place at night.

4. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as set forth above; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as the instant investigation; (c) information obtained from other law enforcement agents based on information they have learned through their narcotics investigations; and (d) from this particular investigation and other investigations involving the interception of wire communications pursuant to a court authorized Title III wiretap.

5. I submit this Affidavit in support of an Application for three Search Warrants to be executed at the premises listed in this paragraph (collectively, the **"Target Locations"**) and as further described in **Attachments A** to the Search Warrants, which **Attachments** are attached and incorporated hereto:

      i.    234 Gallatin Street, Providence, R.I., and its curtilage, including a detached garage. 234 Gallatin Street in Providence, R.I., is a two-story, one-family structure, with an accessible attic area, white in color with brick columns and a wrought iron railing

3

encircling a small front porch area.   The dwelling has one front entrance and one side entrance off the driveway.  This property also has a detached garage to the back.   This property is more fully described in **Attachment A-1** hereto;

   ii.  135 Verndale Street, Providence, R.I., and its curtilage.  135 Verndale Avenue is a two-story, single-family structure, white in color with black shutters.  The dwelling has one white front door facing Verndale Avenue.  To the right of the premises, there is a driveway with a detached garage to the rear of the premises.  The numerals "135" are visible on the front exterior of the residence.  This property is more fully described in **Attachment A-2** hereto;

   (iii) 58 Farragut Street, 2nd floor apartment, Providence, R.I. 58 Farragut Street is a two-story, multi-family structure, beige in color with light color trim.  The dwelling has two front entrances.  Facing the premises, there are two (2) white doors. The white door to the left has the numerals "56" and the white door on the right has the numerals "58." It is believed that the door on the right is the entrance to the second floor apartment. Authorization is also requested for any storage location that may be found in the attic or the basement that is utilized by the second floor apartment.   There is a small front porch area on the first and 2nd floor. To the right of the dwelling is a driveway that leads to the rear of the residence. There is a white fence that surrounds the front yard of the property. The property is more fully described below and in **Attachment A-3** hereto;

  6. Authorization is sought to search the **Target Locations** for evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing a criminal offense, specifically, violations of 21 U.S.C. §§ 841(a)(1) and 846, as described more fully in **Attachments B** to the search warrants, which **Attachments B** are attached here and incorporated by reference.

## A. THIS INVESTIGATION

  7. I have personally participated in this investigation since May of 2005.  I am familiar with the facts and circumstances of this investigation from oral and written reports made to me

4

by other agents of the DEA, other federal, state and local law enforcement agencies, oral and

written reports of conversations and meetings with a number of confidential sources, a review of

consensually recorded conversations, and a review of conversations intercepted pursuant to

court-authorized wiretaps, as well as my own personal participation in the investigation which

includes surveillance and independent investigation.

     8. This investigation has focused on the following individuals: Waskar Pena (PENA),

Eduardo Garcia alias "Heavy D" (GARCIA), Neftali J. Reyes alias "Yoshi" (REYES) (hereinafter

"the **Target Subjects**"). In addition, other subjects who are drug trafficking associates of PENA,

GARCIA, and REYES, have been identified throughout this investigation. As this affidavit is

submitted in support of a search warrant for the **Target Locations** not all the subjects who have

been identified in connection with this investigation are identified herein.

     9. This Affidavit includes a summary of events that I am personally familiar with, as

well as the observations and knowledge related to me by other DEA agents, Providence Police

Department ("PPD") officers and detectives, and other law enforcement personnel who have

been working on this investigation. This Affidavit does not set forth all the facts developed

during the course of this investigation. Rather, it sets forth only those facts that are necessary and

sufficient to establish probable cause to believe that the aforementioned **Target Locations**

contain cocaine, heroin or other controlled substances, U.S. currency, documents and other

records detailing the shipment, financing, purchasing, and distribution controlled substances,

documents confirming travel and other expenses incurred by the organization, and telephones or

other communication devices used to facilitate the illegal distribution of narcotics; as well as

other evidence tending to prove that the aforementioned **Target Subjects** violated  21 U.S.C. §§

5

841(a)(1), 846.

### 2.    Overview of Case

10.    Between May and December 2005, DEA and other law enforcement agents directed two cooperating sources to make more than seven controlled purchases of cocaine, crack cocaine, and heroin from PENA, REYES, and GARCIA, in and around Providence, R.I.. I personally participated in at least seven (7) of these controlled purchases as one of the surveillance agents. During each drug transaction, a cooperating source arranged the transaction directly with PENA, REYES, and/or GARCIA.

11.    On October 31, 2005, the Honorable Ernest C. Torres, Chief U.S. District Court Judge for the District of Rhode Island, signed an order authorizing the interception of wire communications over telephone number (401) 499-7936 (**Target Telephone I**), a T-Mobile cellular telephone subscribed to Ramon Guzman, 92 Doyle Avenue, Providence, Rhode Island. On November 29, 2005, U.S. District Court Judge Mary Lisi signed an order authorizing the continued interception of wire communications over **Target Telephone I.** Interception of **Target Telephone I** is on-going.  On December 8, 2005, the Honorable Ernest C. Torres, Chief U.S. District Court Judge for the District of Rhode Island, signed an order authorizing the interception of wire communications over telephone number (401) 427-5235, a Nextel cellular telephone with International Mobile Subscriber Number (IMSI) 316010102305030, and Direct Connect Number (PTT) 183*909*3298 subscribed to Jose Diaz, 1220 Broad Street, Providence, R.I. (**Target Telephone II**). Interception over **Target Telephone II** is on-going. For the reasons set forth below, it is believed that both **Target Telephone I** and **Target Telephone II** are used by PENA in furtherance of his narcotics trafficking activities.

6

12. In the following paragraphs, I set forth a summary of a number of relevant telephone calls that were intercepted over **Target Telephone I** and **Target Telephone II**. I did not detail all of the relevant telephone calls. I also included parenthetical comments relating to the intercepted conversations which contain my own and other law enforcement agents' interpretation of the coded language being used by the **Target Subjects**. These interpretations are based on my own experience investigating narcotics traffickers and my familiarity with the facts gathered during this investigation. In addition to the intercepted phone calls, I have included information about the physical surveillance law enforcement agents have conducted of the Target Subjects in conjunction with wire interceptions.

**B.   PROBABLE CAUSE AS TO TARGET LOCATIONS**

**1.   234 GALLATIN STREET, PROVIDENCE, RHODE ISLAND**

13. For the reasons set forth below, I believe that 234 Gallatin Street, Providence, R.I., is the residence of Waskar PENA, and is utilized by PENA and others to store controlled substances, proceeds of narcotics trafficking, U.S. currency, and other items that are further described in **Attachment B-1** to this Affidavit, which is incorporated here by reference.

14. PENA is a Hispanic male, thirty years old, approximately 5'7", 145 lbs., with black hair and brown eyes. His date of birth is 1/31/1975 and his social security number is 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. A criminal history check indicates that PENA was convicted of possession of heroin and reckless driving in Rhode Island Superior Court and sentenced to one year suspended sentence with probation. PENA does not have an active Rhode Island operator's license.

15. During August 2005, your affiant was contacted by a previously reliable confidential

7

informant who will be referred to as the CI#1.[1]  CI#1 has provided your affiant and law

enforcement officers with detailed information in the past that has resulted in the seizures of

narcotics as well as the arrest and conviction of at least two individuals for various violations of

the Uniform Controlled Substances Act.  To your affiant's knowledge, CI#1 has consistently

furnished information to your affiant that has been corroborated and proven reliable.

Furthermore, your affiant has never known CI#1 to knowingly provide false or misleading

information.  CI#1 has been paid for information provided in the past and is currently being paid

by the DEA for his information and his participation in this current investigation.  CI#1 has a

prior drug trafficking conviction.  CI#1 is not expected to be called by the government as a

witness in any prosecution arising out of this investigation.  However, insofar as CI#1 has placed

recorded telephone calls to **Target Telephone I**, and participated in controlled purchases of

narcotics with PENA, it is recognized that CI#1 could be called to testify by the defense.

16.    In August 2005, CI#1 identified a Hispanic male known to CI#1 as "Waskar" as a

supplier of heroin and crack cocaine to the Providence area. CI#1 has subsequently identified

"Waskar" as Waskar PENA in photographs shown to him by your affiant. Furthermore, your

affiant has been able to identify Waskar as Waskar PENA through surveillance.  CI#1 has also

identified "Heavy D" as Eduardo GARCIA in photographs that I showed him.  CI#1 further

identified one of PENA's runners as "Yoshi," a Hispanic male.  CI#1 has since identified

"Yoshi" as Neftali REYES in photographs that I showed him.

17  Between September 2005 and December 2005, CI#1 has negotiated at least five drug

---

[1]To protect the identity of CI#1, CI#1 will be referred to in the masculine gender
throughout this affidavit.

8

transactions with PENA. The precise dates of these transactions are known to your affiant but are not disclosed here in order to protect the identity of CI#1. Three of these transactions are summarized in the following paragraphs. As set forth in greater detail below, the transactions were arranged through calls placed to / received from **Target Telephone I** and **Target Telephone II.**

18. In October 2005, CI#1 made a controlled purchase of heroin from PENA. While in the presence of agents from the DEA, CI#1 placed a call to **Target Telephone I** and subsequently ordered another "fifteen," meaning fifteen grams of heroin, from PENA. Upon confirming that PENA had the heroin, PENA and CI#1 agreed on a meeting location. This conversation was recorded with the knowledge and consent of CI#1, and is confirmed by pen register and toll records. CI#1 and his vehicle were searched for contraband with negative results. CI#1 was then provided with U.S. currency. DEA surveillance observed PENA arrive at the meeting location in a 2000 black Cadillac bearing PA registration GDW 2654. This registration comes back to Alixandra Nogueras of Reading, Pennsylvania. Surveillance observed PENA meet with CI#1. Following the meeting, PENA was followed to 234 Gallatin Street in Providence, where surveillance observed him enter the house. CI#1 was followed by DEA agents to a pre-determined meeting location where he turned over the suspected heroin. CI#1 reported that the heroin was delivered by PENA. CI#1 and his vehicle were again searched for contraband with negative results. Laboratory analysis confirmed the substance to be positive for heroin.

19. On another occasion in October 2005, CI#1 again contacted PENA on **Target Telephone I** for the purpose of ordering a quantity of heroin. The calls were recorded with the

9

knowledge and consent of CI#1. Prior to the transaction, DEA searched CI#1 and his car for contraband with negative result, provided him with the money, and followed him to the meeting location. DEA surveillance observed PENA drive to the meeting location from 234 Gallatin Street, Providence. This time, PENA was in a Chrysler Mini Van with temporary Rhode Island license plates. PENA and CI#1 met inside the vehicle driven by CI#1. PENA turned over a quantity of heroin to CI#1 in exchange for U.S. currency. The transaction was videotaped. After the meeting, PENA was observed driving back to 234 Gallatin Street. CI#1 was followed by the DEA to a pre-determined meeting location where he turned over the heroin. CI#1 and his car were then searched for contraband with negative results. The substance field tested positive for the presence of heroin.

20. In mid-November 2005, CI#1 contacted PENA at **Target Telephone II,** in my presence and at my direction, in order to set up a controlled buy of narcotics. During this conversation, CI#1 asked PENA whether PENA was going to bring the "thing they put on bread," referring to butter which is a common code word for heroin. PENA replied that PENA would call CI#1 back. This telephone call was recorded with the knowledge and consent of CI#1. The following day, CI#1 again placed a recorded call to PENA at **Target Telephone II.** During this conversation, PENA asked CI#1 whether CI#1 was speaking about the "four pesos." CI#1 confirmed, and stated that CI#1 did not want "the white women" (referring to cocaine) but that he wanted "the bread" (referring to heroin). PENA acknowledged. CI#1 asked PENA how long it would take PENA to be ready. PENA and CI#1 agreed to meet in about thirty minutes. On that date, however, your affiant did not authorize CI#1 to proceed with the controlled purchase of narcotics.

21.    In late November 2005, your affiant directed CI#1 to make a controlled purchase

10

of heroin from PENA. While in the presence of your affiant, CI#1 placed a direct connect call to

**Target Telephone II** at 183*909*3298. While in the presence of your affiant, CI#1 informed

PENA that CI#1 wanted to buy a quantity of heroin. This conversation was recorded with the

knowledge and consent of CI#1. Following this conversation, CI#1 and his vehicle were

searched for contraband with negative results. CI#1 was provided U.S. currency. CI#1 was

equipped with a video and audio recording device for the transaction. CI#1 was followed to the

meet location, which was a couple of blocks away from PENA's residence, 234 Gallatin Street.

Shortly before the transaction, DEA surveillance was established in the vicinity of the anticipated

transaction location. Moments before the transaction, PENA was observed at 234 Gallatin Street

in Providence. Surveillance observed PENA arrive at the prearranged location driving a silver

Lincoln LS bearing Rhode Island temporary registration. Surveillance observed CI#1 enter the

front passenger seat of PENA's vehicle and remain inside PENA's vehicle for a couple of

minutes. Thereafter, surveillance observed CI#1 return to CI#1's vehicle. CI#1 was then

followed to a predetermined location. Surveillance established at 234 Gallatin Street reported

that PENA was observed at 234 Gallatin Street a short time after the transaction was over. Once

at the predetermined location, CI#1 handed your affiant a quantity of suspected heroin. CI#1

reported that the heroin was delivered by PENA. CI#1 reported that PENA told CI#1 that PENA

was "loaded up" on the "white." Based on information provided by CI#1, as well as

conversations intercepted pursuant to a court-authorized interception of **Target Telephone I,** as

well as your affiant's training and experience in narcotics investigations, your affiant believes that

PENA was telling CI#1 that PENA had a large quantity of cocaine on him, and that PENA was

now distributing more cocaine than heroin. CI#1 and his vehicle were again searched for

11

contraband with negative results.  The substance seized from CI#1 field tested positive for the

presence of heroin.

22.  On November 26, 2005, **Target Telephone I** received an incoming call from

(401) 241-83042 which is believed to be utilized by Neftali Reyes aka "Yoshi" and an incoming

call from (401) 286-8029 which is believed to be utilized by Eduardo Garcia aka "Heavy D."3 In

the above mentioned calls, as well as several previous calls, agents believed that PENA was

explaining to "Yoshi" and "Heavy D" that a shipment of drugs was coming from Chicago. PENA

referred to Chicago as "where the world series was won."

23.  On December 1 and 2, 2005, calls were intercepted between **Target Telephone I** and

(978) 866-8463.  During these calls, PENA was heard speaking to an individual, who identified

himself as JACOB, regarding a shipment of cocaine from Chicago, Illinois.  PENA and JACOB

agreed to meet at PENA's residence, 234 Gallatin Street, Providence, Rhode Island.  During calls

intercepted pursuant to court-order, PENA was heard telling JACOB that PENA had enough

"tickets" (your affiant knows this to be a code word for money) for "four", which your affiant

believes to be four kilograms of cocaine.  JACOB stated that JACOB would then be traveling to

"the city," which your affiant believes to be New York City, to pay JACOB's supplier.  DEA set

up surveillance of PENA at 234 Gallatin Street during the afternoon of December 2, 2005.

PENA was observed driving a silver Cadillac with MA registration which was rented from Hertz

---

2 PENA has greeted the caller as YOSHI on this telephone. YOSHI is a known nickname for REYES.
3 (401) 286-8029, is a pre-paid T-Mobile cellular telephone subscribed to Johanna Sanilia, DOB 1/28/1980, with no
further subscriber information provided.  This telephone was activated on or about August 8, 2005.  This telephone
number is believed to be used by GARCIA.  On or about October 20, 2005, a second confidential informant (CI#2)
used in connection with this investigation received a telephone call from GARCIA.  The caller-identification feature
on CI#2's telephone displayed this telephone number, and CI#2 recognized the caller's voice as that of "Fat Boy" or
GARCIA. Based on calls intercepted over **Target Telephone I**, your affiant has been able to determine based on
voice identification, salutations used by the parties, and concomitant surveillance that this telephone is being utilized

12

in Warwick, R.I.. On the afternoon of December 2, 2005, DEA surveillance observed PENA

driving to135 Verndale Street, Providence, Rhode Island, which is known to be GARCIA's

residence. GARCIA's vehicle was observed outside 135 Verndale Street at the time. DEA

surveillance observed PENA enter 135 Verndale Street and then depart a few minutes later.

Thereafter, surveillance observed PENA drive around Providence and make numerous, quick,

stops throughout the city, including a location known as "Area 4 Zero 1" which is a men's

clothing store and Barber Shop located at 445 Reservoir Ave in Cranston R.I. Your affiant

believes that PENA was meeting with individuals in order to collect money to pay for the

narcotics that he was about to receive from JACOB. At approximately 9:30 p.m. on December 2,

2005, surveillance observed REYES arrive at 234 Gallatin Street (PENA's residence) in a beige

Jeep with RI registration NM-236. PENA's vehicle was observed in the driveway. Surveillance

subsequently observed two males exit 234 Gallatin Street and get into a gold colored Chevy

bearing MA reg. 97VW53. The vehicle pulled around and parked by the driveway of 234

Gallatin Street and waited. A short time later, DEA surveillance observed a white Cadillac,

Illinois registration 7266877 pull up to 234 Gallatin Street and park behind REYES's vehicle. A

check of the registration indicated that the vehicle belonged to Hertz (a rental car company) in

Illinois. Four males were observed to exit the Cadillac and enter 234 Gallatin Street. After the

four males entered Pena's residence, Pena was observed walking from 234 Gallatin and handing

the passenger of the gold colored Chevy a package. The gold colored Chevy then pulled away,

and PENA walked back towards the house. A short time later, a male exited 234 Gallatin Street,

backed the white Cadillac into the driveway of 234 Gallatin Street. Surveillance then observed

by GARCIA.

13

the white Cadillac pull out of the driveway, and noted that it was occupied by four men. A couple of minutes later, REYES and PENA were also observed leaving 234 Gallatin Street. The white Cadillac was followed by DEA surveillance to I-95 South. At around Exit 2 on I-95S (which is near the Rhode Island - Connecticut border), a Hopkinton Police cruiser stopped the vehicle at the request of the DEA. It should be noted, however, that the vehicle was driving at a high rate of speed that was at least ten miles over the posted speed-limit in the area. Immediately following the stop, additional Hopkinton Police cruisers arrived to provide assistance. The driver of the vehicle was identified as Tanvir S. Virk based on an Illinois driver's license that he provided. Virk had three cellular telephones on him. One of these telephones was assigned the number (978) 866-8463. This was the telephone utilized by JACOB to communicate with PENA regarding the cocaine shipment. Accordingly, your affiant believes that Virk is also known as JACOB. The passengers in the vehicle were identified as Yovanny Deleon-Rosario, Julie Nievez, and Manmohan Singh based on driver licenses that they provided. A cellular telephone was also seized from Yovanny Deleon-Rosario. While this telephone was in police custody, Deleon-Rosario received a direct-connect call from **Target Telephone II** and the caller was identified in Deleon-Rosario's phone as WAK-7. At the time of the vehicle stop, the occupants of the vehicle were subjected to pat-down searches. Three of the individuals had knives on them and a fourth had a stun gun. A search of the trunk of the vehicle resulted in the seizure of about $76,000 that was in a clear plastic bag hidden under a blanket, and about $3400 inside a Nextel cellular telephone box. (It should be noted that, based on your affiant's training and experience the wholesale price of a kilogram of cocaine is between $19,000-$20,000). Hopkinton Police Department took all four men to the Hopkinton Police station for further processing. While he

14

was at the station, JACOB stated that he was a "businessman" and that was why he had that money. He later stated that he was in the jewelry business. Following a criminal records check that was negative, the four men were released.   JACOB was issued a traffic summons.

24.  On December 7, 2005, a Cranston Police drug-detection dog was taken to the DEA Providence Resident Office. The dog alerted to the currency that was seized from the white Cadillac on December 2, 2005.  There were no narcotics in the safe where the currency was kept.

25.   On December 8, 2005, the **Target Telephone II** received several direct connect calls with the first starting at approximately 2:49 p.m. regarding two vehicles, possibly a white BMW or a Honda Accord. PENA asked the caller to "wait" for the white BMW or Honda.  At approximately 3:20 p.m. the **Target Telephone II** made an outgoing call in which PENA stated that he had not finished picking up the "tickets" and that PENA will call again. At approximately 4:33 the **Target Telephone II** received an incoming call.  During this call PENA stated that he was "25 pesos short".  At approximately 5:28 p.m. **Target Telephone II** received an incoming call.  During this call, the caller asked if the "girl" arrived.  PENA stated that he had "to solve" the "tickets" for "the guy."  At approximately 5:58 p.m., **Target Telephone II** made an outgoing call and spoke with a male identified as "Jacob."  During this call, Jacob stated that Jacob could not "go incomplete."  At approximately 6:08 p.m., **Target Telephone II** made another outgoing call to Jacob.  PENA told JACOB to tell "Teo" to go to PENA's house.  PENA also told JACOB that he wanted JACOB to come.  At approximately 6:32 p.m., **Target Telephone II** made another outgoing call and spoke with a party identified as "Chumita". PENA told "Chumita" to let PENA know when Chimita was "there" so that PENA could "open" "that thing". At approximately 6:41 p.m. **Target Telephone II** received an incoming call from "Chumita"

15

stating that Chumita was there. Chumita asked PENA to open the garage door. PENA then

cursed at "Chumita" for saying what door. "Chumita" then apologized. At that time, surveillance

observed a silver BMW bearing PA reg. GDY9788 arrive at 234 Gallatin Street. The vehicle then

pulled into the garage. This vehicle was being operated by two males. At approximately 6:48

p.m. GARCIA was observed leaving 234 Gallatin Street. Later that evening, GARCIA's vehicle,

a black Dodge Magnum, was seen at GARCIA's residence,135 Verndale Avenue. At

approximately 7:18 p.m. **Target Telephone II** received an incoming call from "Chumita" asking

PENA to open the door because he was ready. Within minutes, surveillance observed the white

BMW leave from the garage and stop at the driveway and pick up a passenger. The vehicle was

then followed to I-95 South. It should be noted that the voice of "Jacob" mentioned above is the

same voice of Jacob from calls on December 2, 2005. Based on my training and experience and

my involvement with this investigation, I believe that JACOB sent another individual to pick up

additional money from PENA and deliver that money to JACOB. This was because JACOB was

short on money as a result of the seizure by the police a few days earlier. Your affiant further

believes that PENA instructed Chumita to drive the BMW because it is possible that the BMW

had a hidden compartment in it that is commonly used to secret drugs and/or U.S. currency.

26. On the night of December 10, 2005, PENA received an incoming call over **Target**

**Telephone II** and spoke with an unidentified male. During this conversation, PENA told the

UM that PENA needed "seven or ten." The UM asked PENA whether it was for "right away".

PENA replied affirmatively. PENA asked the UM where he was. The UM stated that he was

going to LAWRENCE. PENA also stated to the UM that "the gir" was going to go to the

Dominican Republic on Wednesday. Your affiant believes that during this conversation, PENA

16

ordered seven or ten kilograms of cocaine from the UM. Your affiant believes that the UM was picking up those narcotics from Lawrence, MA. Your affiant believes that PENA wants to sell these narcotics before his female associate departs for the Dominican Republic.

## 2. 135 VERNDALE AVENUE, PROVIDENCE, RHODE ISLAND

27. For the reasons set forth below, I believe that 135 Verndale Avenue, Providence, Rhode Island., is the residence of Eduardo GARCIA, also known as HEAVY D and as "EL GORDO", and is utilized by GARCIA and others to store controlled substances, proceeds of narcotics trafficking, U.S. currency, and other items that are further described in Attachment B-2 to this Affidavit, which is incorporated here by reference.

28. Eduardo Garcia (GARCIA) is a Hispanic male, thirty-three years old, approximately 6'1", 420 lbs., with black hair and brown eyes. GARCIA's date of birth is ▮▮▮▮▮▮) and his social security number is ▮▮▮▮▮▮. GARCIA is known to use the nicknames "Heavy D" , "El Gordo" and "Fat Boy". A Department of Motor Vehicles records check indicates that GARCIA has an active Rhode Island operator's license which expires on 5/22/06. GARCIA's license lists an address of 135 Verndale Avenue, Providence, Rhode Island. A criminal history check indicates that in 1989, GARCIA was charged by the Providence Police Department with Possession of Stolen Motor Vehicle. GARCIA was sentenced to three years probation. In 2002, GARCIA was charged with Manufacture /Possession/ Delivery of over 1 Kilo of Heroin and Manufacture/Possession/Delivery 1 oz. to 1 Kilo Heroin. On 10/01/2003, GARCIA pleaded guilty and was sentenced to five years incarceration with 15 months to serve and 45 months suspended with probation.

29. This investigation also relied on information obtained from a second confidential

17

informant, hereinafter referred to as CI#2.[4]   CI#2 has provided law enforcement officers with detailed information in the past that has resulted in seizures of narcotics, as well as the arrest and conviction of at least two individuals for narcotics offenses.  Your affiant has been informed by Special Federal Officer Michael Dicomitis of the Federal Bureau of Investigation High Intensity Drug Trafficking Area Task Force (FBI HIDTA) that CI #2 has consistently furnished information to SFO Dicomitis that has been corroborated and proven reliable.  Furthermore, your affiant has no knowledge that CI#2 has ever knowingly provided false or misleading information to law enforcement.  CI#2 has prior convictions for assault with intent to rob, possession of narcotics, shoplifting, and driving with suspended license.  In 2005, CI#2 was arrested for possession with intent to distribute narcotics.  Subsequent to that arrest, CI#2 has agreed to cooperate with law enforcement in the hopes of securing a more lenient sentence.  CI#2 is not expected to be called by the government as a witness in any prosecution arising out of this investigation.  During the course of this investigation, CI#2 has participated in a number of controlled purchases of narcotics from REYES and/or GARCIA.  Although the precise dates of these purchases are known to your affiant, they are not disclosed here in order to protect the identity of CI#2.

30. As part of this investigation, SFO Dicomitis met with CI#2  in order to arrange a controlled purchase of crack cocaine from REYES who is known to CI#2 as "Yoshi."   CI#2 has identified "Yoshi" as REYES in photographs presented to him by SFO Dicomitis.  CI#2 also identified an individual known to CI#2 as "Fat Boy" as GARCIA in photographs provided to him by SFO Dicomitis.

---

[4] To protect the identity of CI#2, CI#2 will be referred to in the masculine gender throughout this affidavit.

31. In May 2005, CI #2 placed a controlled call to REYES for the purpose of purchasing crack cocaine. There was no answer. Within a number of minutes, CI#2 received a return call from (401) 954-7937, which is a Sprint PCS cellular telephone subscribed to Eduardo Garcia at 135 Verndale Avenue, Providence R.I. CI#2 spoke with an individual known to CI#2 as "Fat Boy." CI#2 has subsequently identified "Fat Boy" as Eduardo GARCIA. GARCIA told CI#2 to go to 135 Verndale Avenue in Providence. CI#2 and his vehicle were searched by law enforcement for contraband with negative results. CI#2 was then provided with $400 in U.S. Currency and followed to 135 Verndale Avenue. Surveillance observed a Hispanic male known to be GARCIA arrive driving RI registration CE-557, which comes back to a 2005 black Dodge, registered to Eduardo GARCIA (DOB 5-22-70) at 135 Verndale Ave., Providence R.I. FBI HIDTA surveillance was able to observe CI#2 meet with GARCIA inside GARCIA's vehicle. Following the meeting, CI#2 was followed to a pre-determined meeting location where he turned over approximately one half an ounce of crack cocaine. The substance field tested positive for the presence of cocaine. CI#2 reported that the crack was delivered to him by GARCIA. CI#2 and his vehicle were searched for contraband with negative results. It should also be noted that, during this time period, CI#2 reported to SFO Dicomitis that he had observed large quantities of narcotics and U.S. Currency inside 135 Verndale Avenue.

32. In July 2005, HIDTA agents met with CI#2 for the purpose of arranging another purchase of crack cocaine from REYES. CI#2 again placed a controlled call to REYES and was directed to 5-7 Sackett Street, Providence. This telephone call was not recorded but was monitored by law enforcement. CI#2 and his vehicle were searched for contraband with negative results. He was then provided U.S. Currency and followed to the meeting location. CI#2 responded to 5-7 Sackett Street in Providence. That location is further described as a three-

19

family home. HIDTA surveillance observed REYES arrive at that location in a vehicle that was
operated by GARCIA. This was the same vehicle (RI registration CE-557) operated by GARCIA
during the previous transaction. Surveillance observed REYES meet with CI#2 on the driveway
of 5-7 Sackett Street. Following the meeting, CI#2 reported that REYES entered 5-7 Sackett
Street using rear door. Surveillance observed GARCIA stay inside his vehicle and a few minutes
later REYES and GARICA drove away. Following the meeting, CI#2 was followed back to a
predetermined meeting location where he CI#2 reported to SFO Dicomitis that REYES handed
CI#2 about half an ounce of crack cocaine in exchange for $400. CI#2 and his vehicle were
searched for contraband with negative result. The substance was then field tested and indicated
positive for the presence of cocaine.

    33.  In addition, during the period of wire interceptions, agents have conducted frequent
surveillance of GARCIA and of 135 Verndale Avenue. On numerous occasions over the last
several weeks, agents have observed GARCIA, PENA, and/or REYES arrive and depart 135
Verndale Ave., shortly after pertinent calls were intercepted in which PENA referenced various
quantities of cocaine and/or heroin and referencing delivery to a customer. For instance, as set
forth in paragraphs 22 and 23 above, PENA and GARCIA were in telephone and personal
contact on December 1 and December 2, 2005. PENA was observed meeting with GARCIA at
135 Verndale Avenue on December 2, 2005. Based on calls intercepted over **Target Telephone
I** on those dates, it is believed that PENA was collecting money to pay for approximately six
kilograms of cocaine. As set forth above, law enforcement seized just under $79,000 from the
trunk of a vehicle that was observed leaving PENA's house. Similarly, on December 8, 2005,
GARCIA was observed at 234 Gallatin street during what your affiant believes was a money

20

pick-up by a narcotics associate of PENA and GARCIA.

34.  On December 8, 2005, PENA placed an outgoing call over **Target Telephone II** and

spoke to an unidentified male. During this call, PENA stated to the unidentified male that if he

(the UM) did not have all the "tickets", to return "it " to PENA.  PENA then stated that he would

give "it" to GORDO, because "GORDO" needed it.  The UM agreed.  PENA stated that he

wanted the UM to give "it" back to PENA the same way the UM got it.  Based on my training

and experience in narcotics investigation in general, and this investigation in particular, I believe

that PENA was telling the unknown male to return a quantity of narcotics to PENA if the UM

was unable collect the money for it.  PENA stated that GORDO, which is a nickname for

GARCIA, will be able to sell the narcotics.  PENA stated that he wanted the cocaine back in the

same condition that he gave it to the UM.

35.  On December 10, 2005, surveillance observed PENA at 135 Verndale Avenue at

approximately  7:00 p.m.  Previous to that, a call was intercepted over **Target Telephone II** in

which PENA stated that he was at GARCIA's house at the time.  Based on the information set

forth in paragraph  26 above, your affiant believes that PENA was meeting GARCIA to discuss

the delivery scheduled for the night of December 10, 2005.


3.      **58 Farragut Street, 2nd floor, Providence, RI**

36.      I believe that 58 Farragut Street, 2nd floor, Providence, R.I. is the primary residence

of INGRID LNU.   Numerous intercepted calls and observations made during surveillance in

October, November, and December 2005 indicate that PENA routinely comes and goes from 58

Farragut St., 2nd floor. During the court authorized interception of calls it has been determined

21

that "Ingrid" is the girlfriend of Pena, and that numerous times throughout this investigation Pena

has gone to 58 Farragut Street and told "Ingrid" to "come down and open the door." Numerous

times throughout this investigation "Ingrid" has called and stated "I'm home" and Pena would

state that he is on his way to get her. Surveillance would note Pena going into the door marked

58 Farragut, and parking his vehicle in the driveway of 56/58 Farragut Street. For the reasons set

forth below, I believe that there is probable cause to believe that PENA stores U.S. Currency, and

document, and other items described in **Attachment B-3** which is incorporated here by reference,

at this location. As set forth more fully below, based on my training and experience in narcotics

investigations, I know that it is common for narcotics traffickers to secret some of their proceeds

or controlled substances at locations other than their primary residence in order to avoid

detection by law enforcement as well as to protect themselves from robberies by rival drug

traffickers.

37. On November 7, 2005, during the court authorized interception of **Target Telephone I,**

it was determined that PENA was meeting a known associate who is not named here because the

investigation is still on-going, for the payments of "tickets." I know that "tickets" is a commonly

used term of money by PENA. During telephone calls intercepted prior to this meeting, PENA

requested that this individual meet PENA "behind the bank." Surveillance then observed PENA

meeting with this associate in the back of 58 Farragut Street. Based on court-authorized

interception of **Target Telephone I,** your affiant believes that this associate was collecting

money from PENA in connection with drug trafficking activity. Following the meeting, PENA

returned to 58 Farragut Street. During the course of this investigation, based on court-authorized

interception over **Target Telephone I,** your affiant has learned that when Pena referred to

22

"behind the bank" parties would meet with him at 58 Farragut Street.

38. Following both of the suspected money transfers on December 2 and December 8, 2005, which are set forth in paragraphs 23, 25, above, surveillance observed PENA going directly to 58 Farragut Street shortly after the conclusion of both money transfers. Following the December 2, 2005 money transfer, calls were intercepted between PENA and INGRID LNU in which PENA stated to INGRID that he could not wait for the men to leave so that he could go to her house. On December 3, 2005, a call was intercepted between INGRID and PENA over **Target Telephone I**, in which PENA told INGRID that "his friends" were stopped near the Connecticut border, and that they were "stupid." Your affiant believes that PENA was speaking about the December 2, 2005, vehicle stop that was conducted by the Hopkinton Police Department , during which almost $79,000 in U.S. Currency was seized. Based on these, and other interceptions, your affiant believes that PENA confides in INGRID LNU regarding his narcotics trafficking activities, and that INGRID LNU is aware of, and possibly assists PENA, in those activities. During several intercepted calls between PENA and INGRID LNU, INGRID LNU is heard telling PENA that she knows that his "business" comes before her. In addition, on a number of occasions during the course of this investigation, surveillance has placed PENA at 58 Farragut Street at the time that he placed calls over **Target Telephone I** and **Target Telephone II** that were of a criminal nature. This fact, as well, supports your affiant's belief that INGRID LNU is privy to PENA's narcotics trafficking activities.

39. On December 10, 2005, at approximately 3:00 p.m., surveillance observed PENA arrive at 58 Farragut Street. At approximately 3:50 p.m., surveillance observed PENA leave that location and drive down the block to the corner of Farragut and Broad Street, where there is a

23

Citizen's Bank. At that time, surveillance observed PENA exit his vehicle and meet with a

female believed to be Ivon Sanchez and GARCIA. Later on December 10, 2005, PENA received

a call from Ivon Sanchez's husband, Juan SANCHEZ (also known as TOCAYO), at (973) 357-

2382. During this phone call, SANCHEZ thanked PENA "for that." Based on the investigation

up to this point, it is believed that Juan Sanchez is a narcotics associate of PENA. SANCHEZ is

presently residing in New Jersey where he has a pending criminal case. Accordingly, based on

intercepted calls over **Target Telephones I and II,** your affiant believes Ivon SANCHEZ acts as

an intermediary between PENA and her husband. Your affiant believes that PENA provides

Ivon SANCHEZ with money or narcotics to be transmitted to Juan SANCHEZ.

## D.    CONCLUSION

40. Based upon my training and experience, I have learned of, observed, or seized papers

showing dates, names, and amounts, which papers I believe to be drug ledgers; papers and

photographs showing residency or occupancy of said premises; United States currency, which I

believe to be the proceeds of drug trafficking; firearms; controlled substances; and keys for safety

deposit boxes where the proceeds of drug trafficking could be stored. I know from my training

and experience, that drug dealers, more often than not, keep records containing names, addresses,

and telephone numbers of purchasers and suppliers of controlled substances, and records of

amounts of money owed both to and by the drug seller. These records are necessary to further

the business of selling controlled substances. Furthermore, I know from my training and my

experience, that these records are maintained not only in paper form, such as bound books,

notepads, and pieces of paper, but also in the form of electronic storage such as floppy computer

24

disks and computer hard drives. I further note, based upon my training and my experience that drug dealers oftentimes keep proceeds of their drug sales either in their homes and other premises used by them or in safety deposit boxes. They do this to avoid forfeiture of said monies placed in bank accounts and to avoid detection of said proceeds by the Internal Revenue Service.

41.    I further know from my training and experience that drug traffickers:

a)    often place their assets in names other than their own in order to avoid detection and forfeiture of those assets by government agencies;

b)    continue to use the assets referred to in subparagraph (a) above and to exercise dominion and control over those assets;

c)    readily maintain large sums of cash to run and finance their drug trafficking activities;

d)    attempt to legitimize the financial profits made from drug trafficking, and that in order to accomplish this, they utilize domestic and foreign banks, their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts;

e)    usually maintain paraphernalia for the packaging, cutting, weighing and distributing of controlled substances, including paraphernalia such as, but not limited to, scales, plastic bags, cutting agents, drawings, charts and maps.

42.    I know from my training and experience that persons who traffic in controlled substances normally maintain their records for long periods of time regardless of whether their value to the drug dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes these individuals do not

25

even realize the incriminatory nature of the documents they keep. I know of the execution of search warrants where documentary evidence dating back many months has been found. Furthermore, I know from my training and experience, that drug trafficking activities are conducted in both daytime and nighttime hours. Drug trafficking activities are not limited to only daytime hours because drug traffickers will take possession of controlled substances and will deliver controlled substances whenever those opportunities present themselves. It is my experience that many such opportunities occur during nighttime hours. Furthermore, I know from my training and experience that drug trafficking is an ongoing and continuous activity.

43.     Based upon the foregoing and the attachments to this affidavit, I believe that probable cause exists to believe that the **Target Subjects** and others are traffickers in multi-kilogram quantities of cocaine and heroin. I believe that there is probable cause to believe that the **Target Locations** contain: cocaine; heroin; paper and electronically stored records of controlled substance transactions; paper and electronically stored records containing names, addresses and telephone numbers of purchasers and suppliers of controlled substances; paper and

26

electronically stored financial records relating to drug trafficking; records and photographs

indicating ownership, occupancy and control of the described premises; proceeds, such as United

States currency, derived from controlled substance transactions; and safety deposit box keys; all

in violation of Title 21, United States Code, Section 846.


DATED THIS _11th_ DAY OF DECEMBER, 2005.


Michael S. Naylor
Task Force Agent
Drug Enforcement Administration
Providence, RI


SWORN TO AND SUBSCRIBED TO BEFORE ME
IN PROVIDENCE, RHODE ISLAND,
THIS _11th_ DAY OF DECEMBER, 2005.

LINCOLN D. ALMOND
UNITED STATES MAGISTRATE JUDGE

27

**Attachment A-2**
**135 Verndale Avenue, Providence, RI**

**Premises to be Searched**

135 Verndale Avenue is a two-story, single-family, structure, white in color with black shutters. The dwelling has one white front door facing Verndale Avenue. To the right of the premises, there is a driveway with a detached garage to the rear of the premises. The numerals "135" are visible on the front exterior of the residence.

The following is a true and accurate photograph of 135 Verndale Avenue, Providence:

29

**Attachment B-2**
**135 Verndale Avenue, Providence, RI**

**Items to be Seized**

1.  Controlled substances including cocaine and/or heroin;

2.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.  Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

4.  Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6.  Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

7.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

8.  Keys to safety deposit boxes.

9.  Cameras and surveillance equipment.

10. Cellular telephones.

30

ATTACHMENT A-2



135 Verndale Avenue, Providence, RI